IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| CARRIE CARMODY, an individual, | ) ) | Case No. CV-04-497- S-MHW |
| | ) | |
| | ) | **MEMORANDUM DECISION** |
| Plaintiff, | ) | **and ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| BED BATH & BEYOND, a New York | ) | |
| corporation, | ) | |
| Defendant. | ) | |
| _____ | ) | |


Currently pending before the Court is the Defendant's motion for summary judgment

(docket # 21), filed December 16, 2005.  The Court, having reviewed all of the parties'

submissions and having heard oral argument, finds that the motion for summary judgment should

be granted.

**I.**
**Introduction.**

Plaintiff Carrie Carmody ("Carmody") was an employee of Bed, Bath & Beyond

("BBB") at its Meridian store ("Store") in various managerial positions from August, 2000, until

her employment was terminated in July, 2003.  She alleges that, during her employment, she was

discriminated against on the basis of gender and religion, and after she complained to the BBB Human Resources Department, she alleges that she was retaliated against.

More specifically, Carmody alleges in her amended complaint that James Lancaster, the Store manager and a member of the Church of the Latter Day Saints ("LDS"), treated the LDS employees more favorably than he treated non-LDS employees, including Carmody, and that this created a religiously hostile work environment.  She also alleges that Lancaster engaged in gender discrimination in that he treated male staff members more favorably than he treated her. Carmody had filed claims for intentional/negligent infliction of emotional distress under state law, however, she stated in her response brief that she would voluntarily dismiss these claims "to the extent that the claims could be construed to be separate and distinct" from the damages recoverable under Title VII of the Civil Rights Act.

## II.
## Standard of review.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56, which provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The United States Supreme Court has made it clear that under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he/she will bear the burden of proof at trial.  *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986).  If the nonmoving party

fails to make such a showing on any essential element of his case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. *See also* Fed. R. Civ. P. 56(e).

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial,"*Hahn v. Sargent*, 523 F.2d 461, 463 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289 (1968)), *cert. denied,* 425 U.S. 904 (1976), or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   The Ninth Circuit cases are in accord.  *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

### III.
### Discussion.

Carmody has asserted three claims: a religiously hostile work environment, gender discrimination, and retaliation, and the Court will discuss each separately, recognizing that there will be some overlap because the facts are involved in more than one claim.  For each claim, the Court will first discuss the factual basis for the claim[1], the legal standards that apply to that claim and, finally, whether the Defendant is entitled to summary judgment as a matter of law.

---

[1]      Since this is a motion for summary judgment, Plaintiff is entitled to have all facts and inferences construed in her favor and the Court recitation of the facts will be phrased in such a manner.

However, before starting with that analysis, the Court will briefly discuss the underlying history of the Meridian Store and the management structure of BBB.   The Store opened in September, 2000, and its first manager was Jane Dopps.  She served as Store manager until July, 2001, when she was replaced by James Lancaster ("Lancaster") who had been the Assistant Store Manager.  During Dopps' tenure as Store Manager, she never received any complaints from Carmody about alleged gender discrimination or a religiously hostile work environment.

Carmody was hired and started work on August 25, 2000, and in September, 2000, started her first managerial position as the linens department manager.  Prior to being hired, Carmody was interviewed for the position by Albert Allen, a Senior District Manager with responsibility for several BBB stores in the Northwest.  Mr. Allen's office was located in Seattle, and  Suzy Hansch, the West Coast Human Resources was also present from Seattle during the interview process.

Mr. Allen stated that, while he consults with the local store managers, he makes the hiring  decision for all managerial store employees.  The Store has three Assistant Store Managers who would be responsible for a particular department.[2]  Allen made the decision to approve the transfer of Mike Kelsey from a store in Washington to the Meridian Store as an Assistant Store Manager.  At the time, according to Allen, Kelsey had more experience with BBB than Carmody did, who also wanted to be promoted to the position.

Allen was involved in later promoting Carmody to Assistant Store Manager when a position came open on November 25, 2001, based on the recommendation of Lancaster. During

---

[2]        During Carmody's tenure with BBB, not all three senior manager positions were filled all of the time.

the Spring of 2002, Lancaster was requested by BBB to provide assistance and training at other

BBB stores in the Northwest.  These assignments would at times last several weeks.  When

Lancaster was on these assignments, the responsibilities of conducting the day-to-day operations

of the Store fell on the three Assistant Store Managers.  Lancaster left the Store in March, 2003,

when he was promoted to Area Manager.   Allen was also involved in several disciplinary

matters involving Carmody which will be developed in more detail later in this opinion.

Lancaster was replaced by Greta Mohr, who started working at the Store on June 30,

2003.  On her first day at the Store, Mohr was approached by another Store employee, Lindy

Hancey, the Office Manager, who advised her that Carmody has asked Hancey to confirm the

weekly payroll since Carmody was not going to be at the Store.  Carmody had given Hancey her

password for computer access to perform this function.  Hancey told Mohr that she had never

done this function before and did not feel comfortable doing it.  Mohr told Hancey that she

would do the payroll confirmation.

Mohr reported these events to the District Human Resource Manager and District Loss

Prevention Manager because Mohr did not believe it was appropriate for Carmody to give her

personal password to Hancey to do payroll confirmation.  Carmody was interviewed by the

District Loss Prevention Officer on July 10, 2003 and gave a statement regarding the event.

Following the interview, Mohr was instructed by Allen and Hansch to terminate Carmody's

employment.

With this background, the Court will now turn to the individual claims.

**A.      Religiously Hostile Work Environment.**

Carmody states that during Lancaster's tenure as Store Manager, the Store became deeply divided between LDS and non-LDS employees.  She states that this permeated the day to day working relationship among the employees and identifies points to the late Spring of 2002 as the point in time when the religious division between the employees started to manifest itself into a truly hostile work environment.

It was during this time that Lancaster was out of the Store a considerable amount of the time assisting other BBB stores in the Northwest.  When he was gone, both Ken Kannon, another Assistant Store Manager, and Carmody would share management duties.  Carmody states that Lancaster retained all responsibilities for personnel actions.  She states that there was bickering between the LDS employees and non-LDS employees.  Also, she felt a perception existed that LDS employees got preferential treatment from LDS supervisors and, when Lancaster was out of the Store and she was one of the senior manager, the LDS employees would not listen to her or follow her instructions, and instead waited for Lancaster to return to complaint to him.

Carmody asserts that the primary basis for the tension between the two group of employees was that the non-LDS employees would socialize after work, which included drinking, dining and dancing.  She sensed that the LDS supervisors and employees felt this activity was morally inappropriate.  Summarizing, Carmody contends, "This divide influenced work-place decisions, polluting the atmosphere on the job.  The atmosphere in the Store was permeated by the judgmental attitudes and based on religious beliefs and the reaction of those people against the moralistic overtones."  (Plaintiff's response brief, docket # 27, at 9.)

Carmody states that she advise Lancaster of these problems, but that his response was that he did not see any religious bias at the Store.  Lancaster was out of the Store in June 2002

when the managers had a meeting.  Following that meeting, Carmody believed that the issues

between the non-LDS and LDS members were affecting the daily Store operations.  Because

Carmody believed that Lancaster had not delegated the authority to handle personnel matters,

she elected to call Suzy Hansch, at the Human Resources Department in Seattle.

   Carmody outlined to Hansch the religious division between the LDS and non-LDS

employees at the Store.  Hansch asked Carmody why she could not deal with the situation, and

Carmody explained that she did not have the authority and that the matter needed to be mediated.

Hansch responded that she would come to the Store in July, 2002.   When Lancaster returned to

the Store, he learned that Carmody had called the regional office to complain about religious

favoritism.  Lancaster allegedly became angry at Carmody and told her that this put him, as the

Store manager, in a bad light with the regional office.  Lancaster told Carmody that she owed her

promotion to him and that, if she did not like his management style, then she could look for work

elsewhere.  Further, according to Carmody, he told her that he intended to run the Store in a

"Zionist fashion."  Lancaster did not explain what he met when he used that description of his

management style.  Carmody did not ask him what he meant, but testified in her deposition that

she understood it to mean that Lancaster was to be the patriarch of the Store and females were to

be subservient to him.[3]   Carmody testified in her deposition that her feelings of favoritism were

---

[3]  Zionist or Zionism has several possible meanings. WEBSTER'S THIRD INTERNATIONAL
DICTIONARY (1972) defines Zionism as a theory, plan or movement for setting up a Jewish national or religious
community in Palestine.  Within LDS doctrine, Jews are regarded as one of the ancient covenant people with a
prophesied role in the contemporary gathering of Israel and that the first Israelite tribe, Ephraim, would build a new
Jerusalem in American Zion and Jews would gather in the land of their fathers to rebuild "old" Jerusalem, all as a
secular preparatory stage for the messianic era.  ENCYCLOPEDIA OF MORMONISM, Vol 4, World Religions
(1992).  Any in depth analysis of the relationship between the LDS Church and the development of a Zionist nation,
either in the United States or Israel,  need not be developed further here, other than to note that it apparently has
nothing to do with Ms. Carmody's subjective understanding of the term.

largely based on her perceptions and that the judgmental atmosphere "set up a feeling of discrimination if you weren't Mormon."  Carmody Depo. at 125-126.

As will be discussed later, this confrontation between Carmody and Lancaster became part of the basis of her claim that Lancaster thereafter retaliated against her because of her complaint of religious preference at the Store.

In moving for summary judgment on this claim , BBB argues that Carmody was not subject to hostile work environment because the alleged conduct was not so pervasive as to alter the conditions of employment.  Further, even accepting Carmody's rendition of the facts, the conduct she complains of was not of a religious character.  Finally, it is based on Carmody's perception of what was going on between other employees and, other than making her management job perhaps more difficult, was not directed at her.

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that it is "an unlawful employment practice for an employer . . .  to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-(a)(1).  The Supreme Court stated that this language is not limited to " 'economic' or 'tangible' discrimination.  The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment of men and women' in employment," which includes requiring people to work in a discriminatorily hostile or abusive environment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986), *quoting Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n. 13 (1978).  When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment,"

then Title VII is violated. *Meritor*, 477 U.S. at 65, 67.

        This standard was reaffirmed in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), and

was defined as taking "a middle path between making actionable any conduct that is *merely*

*offensive* and *requiring the conduct to cause a tangible psychological injury. Id.* at 21, emphasis

added. The Court went on to explain in detail what the standard means by stating the following:

> [M]ere utterance of an ... epithet which engenders offensive
> feelings in a [sic] employee, does not sufficiently affect the
> conditions of employment to implicate Title VII. Conduct that is
> not severe or pervasive enough to create an objectively hostile or
> abusive work environment - - an environment that a reasonable
> person would find hostile or abusive - - is beyond Title VII's
> purview. Likewise, if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no Title VII
> violation
>
> * * *
>
> A discriminatorily abusive work environment, even one that does
> not seriously affect employees' psychological well-being, can and
> often will detract from employees' job performance, discourage
> employees from remaining on the job, or keep them from
> advancing in their careers. Moreover, even without regard to these
> tangible effects, the very fact that the discriminatory conduct was
> so severe or pervasive that it created a work environment abusive
> to employees because of their race, gender, religion, or national
> origin offends Title VII's broad rule of workplace equality.

*Harris*, 510 U.S. at 21-22, (internal citations and quotation marks omitted). Thus, the *Harris*

Court affirmed that so long as the environment would reasonably be perceived by the employee

to be hostile or abusive, then it need not also be psychologically injurious for there to be a Title

VII violation. *Meritor*, 477 U.S. at 67.

**Memorandum Decision & Order - Page 9**

The "religiously hostile environment" alleged by Carmody involved incidents of "bickering and division" among employees that divided along religious lines, those who were LDS and those who were not.  (Carmody Depo. at 120.)  According to Carmody's testimony, employees would have discussions about "lifestyles," moral versus immoral, the desire by a Mormon employee's brother to only rent an apartment to a member of the Church, the desire by a Mormon employee to not have to work on Sundays, the feeling by non-LDS employees that they were being "judged" by the Mormon employees, "the LDS factor" was continually brought up in conversation and comments would be made by various LDS members in the Store such as "I can't believe you were drinking." (Carmody Depo. at 125-27.)

As to Carmody's  recitation of the facts surrounding the division among employees along LDS and non-LDS lines, in particular, it is one of an observer of what was happening to other employees rather than herself.  In other words, Carmody, as a manager, was trying to figure out how to manage the division among the employees and she does not state how she personally was affected by it or was embroiled in it, but more simply that it existed among others.  In this regard, Plaintiff's hostile work environment claims cannot even be found to be subjective, let alone objective, and the claims therefore do not meet the *Harris* test.  *Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - - an environment that a reasonable person would find hostile or abusive - - is beyond Title VII's purview.")   Also Carmody has framed many of her concerns about the religious bickering as her personal judgment of how the conduct was affecting others. *See Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th. Cir. 1996)(a plaintiff's personal judgment about her own competence to do her work does create triable issues of fact).

Generally, actionable conduct giving rise to a hostile work environment include activities such as lecturing employees about their sins and prospects for salvation. *See Venters v. City of Delphi,* 123 F.3d 956, 976-77 (7th Cir. 1997). Even patently offensive comments that are sporadic and reveal no religious animus towards a plaintiff are insufficient to support a claim of hostile work environment. *See Shaabat v. Blue Cross Blue Shield of the Rochester Area,* 925 F.Supp. 977 (W.D.N.Y. 1996).

When determining whether an environment is sufficiently "hostile" or "abusive" to violate Title VII, courts must look to all the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan v. California Youth Authority*, 217 F.3d 1104, 1110 (9th Cir. 2000), *quoting Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)(internal quotations omitted). The effect of the conduct on the employee's psychological well-being is relevant to determining whether the employee actually found the environment abusive and is to be taken into account, as any other relevant factor would be, but no single factor is required. *Harris*, 510 U.S. at 23.


Accepting Carmody's assertions in a light most favorable to her, these occurences and/or perceptions did not create a severe and pervasive hostile work environment so as to implicate Title VII. The Court finds that the conduct of Lancaster, and the perception of friction between LDS and non-LDS employees at the Store, even when viewed in a light most favorably to the Plaintiff, are legally insufficient to support a claim of a religiously hostile work environment

because Carmody's assertions are subjective and are not severe or pervasive enough to create an objectively hostile or abusive work environment.

**B.      Gender Discrimination.**

Carmody bases her discrimination claims on a series of alleged events that occurred between the early Summer, 2002, until the time her employment was terminated in July, 2003. In general, these events fall into the categories of incidents involving alleged "favoritism" toward male managers and/or employees over Carmody as a female manager.

The first incident that Carmody cites as an example of how she was treated differently on the basis of gender involved a promotion of a male employee over her.  As mention earlier, in March, 2001, Allen made the decision to transfer Mike Kelsey, from Seattle to work at the Store as an Assistant Store Manager.   Carmody thought she should have been given promotion but was told to be patient and she would receive her own promotion soon.  (Carmody Depo. at 66.) She also testified that Lancaster "discriminated against the female managers" and that she "was held to a much higher standard."  (Carmody Depo. at 153.)  As far as the male department managers were concerned, as a senior manager, Carmody testified that  "we were to get them [the male department managers] on a fast track, get them to be businessmen, to get them promoted as soon as possible."  (Carmody Depo. at 154.)

By way of an example as to how she was held to a different standard, Carmody  testified that Lancaster told her, "I expect more from you, Carrie, than I do the others because I know you can do more than the others can do."  (Carmody Depo. at 154.)  Carmody also testified that there would be times when she directed department managers to perform certain tasks and if the task was not done, and then still not completed again after she spoke to the department manager

again, then Carmody would ask Lancaster to intervene with the person.  Carmody stated that Lancaster would always compel the female department managers to complete the work as directed, but that when it came to male department managers, he would find excuses not to compel the work, thereby undermining her authority as a manager.

Carmody's assertion of  a gender-based claim of discrimination are not entirely consistent with the undisputed facts in this case.  In her deposition, she testified that: she did not believe that her compensation was impacted on account of her gender (Carmody Depo. at 70); she was officially placed in charge of the Store during Lancaster's absence in November, 2002 (Carmody Depo. at 103); and Lancaster was the one who promoted her to senior manager from department manager in the first place.

Beginning in the Summer of 2002, when Lancaster began being absent from the Store for long periods to assist other stores, Carmody and another senior manager were left in charge. They were not allowed to make decisions about personnel matters, however.  Therefore, when Lancaster returned to the Store for a brief visit, Carmody presented personnel problems that had come up while he was gone and asked him to deal with it.  Taking the evidence of record in a light most favorable to Carmody, the Court does not find that the alleged incidents give rise to a triable issue of fact concerning the issues of gender discrimination.  The incidents of record and cited here are occasional, brief comments which appear to reflect a clash of personalities, or perhaps low morale among employees, rather than a discriminatory motive.

For instance, the fact that one male from Seattle was promoted to a senior manager before she was is of little consequence.  BBB explained in Allen's affidavit that the reason this occurred was that the person who was promoted actually had more experience with BBB than

Carmody did at the time. Carmody was promoted to a senior management position soon thereafter. And while Carmody testified that she was told by Lancaster that she was held to a higher standard because Lancaster stated he "expected more of her," there is no evidence of record as to how this transitioned into actual discriminatory conduct, either actual or alleged. As one the Eleventh Circuit Court of Appeals noted almost 20 years ago, "Title VII prohibits discrimination; it 'is not a shield against harsh treatment at the workplace.'" *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986), *cert. denied*, 479 U.S. 1034 (1987).

For all of the foregoing reasons, the Court finds that Plaintiff's claims of gender based discrimination must fail and that summary judgment should be entered in favor of the Defendant.

## C.     Retaliation Claim.

### 1.     Prima Facie Case.

The proper legal framework for determining whether Plaintiff's retaliation claim should survive is presented under the case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In a Title VII disparate treatment case, a plaintiff must first establish a *prima facie* case of discrimination under this burden-shifting test. *Id.* at 802. In particular, she must show: 1) she belongs to a protected class; 2) she was performing her job in a satisfactory manner; 3) she was subjected to an adverse employment action; and 4) other similarly-situated coworkers were treated more favorably. *Id.*

If plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Id.* at 802. If the defendant does so, then the burden shifts back to plaintiff to demonstrate that the articulated reason was a pretext for unlawful discrimination by " 'either directly persuading

the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000), *quoting Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

While the burden of production may shift, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253.  As a general matter, however, the Court acknowledges that the Ninth Circuit has stated that  "the requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is *minimal* and does not even need to rise to the level of a preponderance of evidence."  *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted) (emphasis added); and *see also Sischo-Nownejad v. Merced Cmty. College Dist.,* 934 F.2d 1104, 1110-01 (9th Cir. 1991) ("[T]he amount [of evidence] that must be produced in order to create a *prima facie* case is very little.")

As established, Carmody has the first task of setting forth her *prima* facie case.  Carmody can easily establish the first prong, that she is a member of a protected class, as well as the third prong, that she was subjected to adverse employment actions.  However, it is the second and fourth prongs that are critical to Carmody's *prima facie* case.  Carmody alleges that she was performing her job in a satisfactory manner and that the disciplinary reports were the by-products of her taking complaints about Lancaster's male favoritism and the religious divide among employees "up the chain of command" to regional BBB supervisors.  She additionally alleges, for instance, that other coworkers were not disciplined when they brought their children to work, but she was written up, so they were therefore treated more favorably.

**Memorandum Decision & Order - Page 15**

As to the second prong, there is little evidence of record to support Carmody's contentions that she was performing her job in an entirely  satisfactory manner, that she did nothing to deserve the disciplinary reports, or that the reasons given for the issuance of the reports were pretext to have her eventually fired.  In addition, the reports were issued by three different sets of managers, and not just by her direct manager,  Lancaster, so there was more than one person in the upper management structure observing what they deemed to be "unprofessional behavior" on her part.

The Court has carefully reviewed the facts asserted by Carmody in support of the fourth prong of the *prima facie* test, and there does not appear that there is evidence of record for Plaintiff to satisfy this prong.  The only instance of "other similarly situated coworkers" that Carmody can point to is when other coworkers brought their children into work.  The other coworkers that did were not disciplined as she was.   However, the record is not clear as to whether those coworkers were actually on company time during each instance when their children accompanied them to the Store, or if they were there on their own time.  Otherwise, there are no other comparative instances that Carmody relates of examples when her behavior was disciplined and another coworker's was not for the same conduct.

While Carmody's evidence in support of her *prima facie* case may have difficulty reaching the "minimal" bar set by the case law, the Court is mindful that it does not take much to reach that level, which can either be direct or circumstantial evidence.  Therefore, the Court will assume, *arguendo*, that Carmody could establish a *prima facie* case.  With that in mind, the Court will move to the next step in the *McDonell Douglas*  framework, and will examine whether BBB has established legitimate, nondiscriminatory reasons for its disciplinary action

**Memorandum Decision & Order - Page 16**

against Carmody or whether, as argued by Carmody, these actions were a pretext for unlawful discrimination and retaliation.

### 2. Pretext.

The Court would be remiss if it did not acknowledge the recent Ninth Circuit decision of *Cornwell v. Electra Central Credit Union,* 439 F.3d 1018 (2006), which provides a detailed review of the treatment of evidence of pretext in view of the Supreme Court's decision in *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003), and is likewise instructive to the issues now before the Court. At first, the Supreme Court identified two methods by which a disparate treatment plaintiff could meet the standard of proof required by Fed. R. Civ. P. 56(c) to rebut the presumption of a *prima facie* case. One way was that a disparate treatment plaintiff could offer evidence, direct or circumstantial, "that a discriminatory reason more likely motivated the employer" to make the challenged employment decision. *Cornwell*, 439 F.3d at 1028, *citing Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). If a plaintiff relied on circumstantial evidence to show that a defendant's nondiscriminatory justification for an employment decision was a pretext, that circumstantial evidence had to be "specific" and "substantial" to create a genuine issue of material fact. *Cornwell*, 439 F.3d at 1029, *citing Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998).

In *Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003), the Supreme Court confirmed that a plaintiff may rely successfully on either circumstantial or direct evidence to defeat a motion for summary judgment in a Title VII action. *Cornwell*, 439 F.3d at 1029, *citing Costa* at 92 (holding that a plaintiff does not have to produce direct evidence of discrimination to obtain a mixed-motive jury instruction under Title VII, and suggesting that a plaintiff suing under Title VII may

prove his or her case using either circumstantial or direct evidence).  The Court went on to explain that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep rooted:  'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"  *Cornwell*, 439 F.3d at 1030, *citing Costa*, 539 U.S. at 100 (*quoting Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n. 17 (1957)).

In *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004), the Ninth Circuit applied *Costa* to the question of what evidence must a plaintiff alleging disparate treatment present to survive summary judgment.  The plaintiff in that case alleged a disparate treatment claim under 42 U.S.C. § 2000-e2(a)(1), as does Carmody here.  Reading *Costa* to require that "circumstantial and direct evidence should be treated alike," the Ninth Circuit held that McGinest offered sufficient evidence to defeat summary judgment, even though McGinest's evidence was circumstantial.  *Cornwall*, 439 F.3d at 1030.   Following this lead, the *Cornwell* Court concluded that "in the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence.  *Id.*, *citing Costa*, 539 U.S. at 100, and *McGinest*, 360 F.3d at 1124.

In *Cornwell*, plaintiff asserted a claim for racial discrimination and retaliation under 42 U.S.C. § 2000e-2(a)(1).  Cornwell alleged that he, as the only African-American member of the credit union management team, was treated differently than the white management team members.  Cornwell was first hired in 1993 as the director of lending.  He was promoted to vice president and chief operating officer in 2000.  In late 2001, the credit union hired a new chief executive officer named Sharp.  From the beginning of Sharp's employment, whenever he held

meetings with the management team, he would exclude Cornwell from the meetings, usually not even notifying Cornwell when they were taking place, and often matters regarding Cornwell's job responsibilities would be discussed during the meetings. About two months after Sharp began his employment, he announced to the management team that he intended to reorganize operations.

Sharp went about holding a series of meetings regarding the reorganization plans, which would have an impact on Cornwell's job responsibilities, but again excluded Cornwell from the meetings.

In December, 2001, about six weeks after the reorganization process started, Cornwell asked Sharp what changes would affect his job and Sharp told Cornwell that it had already been decided that a new vice president position was being created, that a white woman was being promoted into that position, that half of Cornwell's duties were going to be reassigned to a white male who was being promoted to the management team who had not previously been a manager, that Cornwell's Chief Operating Officer position was being eliminated, and that Cornwell was being demoted back to vice president of lending only. Cornwell was the only member of the management team to be demoted. When Cornwell asked Sharp why he had not be included in the reorganization planning process, Sharp's answer was of offer to help Cornwell find another job. *Cornwell*, 439 F.2d at 1032.

The next day, Cornwell made his second inquiry with the Human Resources department about whether race was a factor in Sharp's conduct. He was advised to take his concerns of racial discrimination to the Credit Union Board of Directors. In the end, neither Human Resources or the Board of Directors investigated Cornwell's concerns of racial discrimination

**Memorandum Decision & Order - Page 19**

and his employment was terminated in July, 2002.  The Ninth Circuit, as stated above, disagreed with the district court's finding on summary judgment that Cornwell had not produced "specific and substantial evidence to raise a factual issue that the true reason for his demotion . . . was race discrimination or that the stated reasons were false."  *Cornwell*, 439 F.3d at 1031.  Instead, the Ninth circuit held that the defendant was not entitled to summary judgment on the issue of whether Sharp's demotion of Cornwell was in violation of Title VII for the reason that Cornwell had presented enough evidence for a reasonable jury to find that "a discriminatory intention was at work, and in our view Cornwell presented sufficient evidence to place this issue in the jury's province for decision."  *Cornwell*, 439 F.3d at 1034.[4]

Turning back to the facts alleged by Carmody in her retaliation claim, there are three specific instances of retaliation alleged.  Carmody alleges that she was retaliated against for having filed complaints with Lancaster, and then for taking her complaints "up the chain of command" when her complaints were not resolved by him to her satisfaction.  The first instance of retaliation Carmody alleges occurred when she received an "employee disciplinary notice" on October 22, 2002, with a "warning."  The notice stated that Carmody was to receive a review of the matter in thirty (30) days from the date of issuance.

The disciplinary notice was issued by District Manager Allen and Store manager Lancaster  for "conduct unbecoming a manager," and for bringing her child to work during duty hours.  Allen has stated in his affidavit that the fact that Carmody's child was present in the Store

---

[4]       It should be noted, however, that the Ninth Circuit did *not* find that Cornwell had presented sufficient evidence to create a genuine issue of material fact as to whether the defendant *fired* him on the basis of race, nor did Cornwell present enough evidence to rebut the presumption of the *McDonnell Douglas* framework to warrant a trial on his retaliation theory.  *Cornwell*, 439 F.3d at 1034-35.

during her working hours was not the only basis for the discipline.  Specifically, he had received

information that several employees had made the decision to leave employment with BBB or

threatened to quit their employment because of the treatment they had received from Carmody in

her role as a manager.  Carmody's performance evaluations lend support to Allen's concerns

about Carmody's relationship with her subordinates.  An excerpt from the July 15, 2002, review

states "**Personal/Management skills.**  This is an area with mixed reviews for me [Lancaster].

Although I believe Carrie to have great management capabilities, her communication

inconsistencies tend to cloud issues at times with associates and other manager.  We have spoken

at length on many occasions concerning this matter."  An excerpt from a July 23, 2001, review

by Lancaster states, "**Personal Work Characteristics.**  With you specifically, I would like to

see you build your patience with others, not lower your expectations, but deliver your messages

when under pressure in a professional manner at all times.  Teach those around by example!"

      The second instance of retaliation Carmody alleges occurred when she received a second

"employee disciplinary notice" on February 7, 2003, with a "warning."  This was issued by

District Manager Allen and Suzy Hansch, the District Human Resources Manager,  for retrieving

confidential information from Lancaster's desk during one of his absences without his

authorization, and for conducting her own investigation by soliciting employee statements, also

without authorization, resulting in a breach of confidentiality with employees.  Carmody  was

"placed on final notice regarding her unprofessional behavior," because this was her second

notice, and she was also notified that "a follow up review to determine continued employment"

would be conducted in 90 days.

The final instance of retaliation that Carmody alleges occurred was when she was terminated from her employment on July 10, 2003.  The reason given for termination was violation of company rules in that Carmody gave her computer security password to an associate employee and asked the associate to perform a payroll confirmation function under Carmody's password that is only supposed to be performed by a senior manager.  BBB asserts that this was a breach of the company's computer security policy because no employee is supposed to give another employee access to a personal password.  In addition, by giving the subordinate employee her password, Carmody was potentially giving the subordinate employee access to a lot of personnel and other business information about the company that a lower level employee would normally not be allowed to access.  Carmody asserts that other employees had given out their passwords before and had not been disciplined for it.  However, Carmody has not presented evidence as to the circumstances under which this occurred, such as if it involved another senior manager giving his password to a subordinate, or whether the person who gave out the password was caught but was not disciplined for their conduct.

The Court has stated that it will assume, *arguendo*, that Carmody has established a *prima facie* discrimination claim under *McDonnell Douglas*, 411 U.S. at 802.  As a result, Carmody is entitled to a presumption that she was retaliated against by being progressively disciplined for her complaints to the Human Resources Department which led to her eventual termination.  However, BBB has offered admissible evidence that Carmody was progressively disciplined between October, 2002, and July, 2003, for "legitimate, nondiscriminatory" reasons.  The Court finds, whether it applies the "specific" and "substantial" evidence of pretext or whether Carmody just has to present "some" evidence, direct and/or circumstantial, that Carmody did not produce

**Memorandum Decision & Order - Page 22**

sufficient evidence to show that the real reason behind her termination was to retaliate against her for asserting a claim of a religiously hostile work environment or gender discrimination.

If one compares the circumstantial and direct evidence that Cornwell presented in his case to the evidence presented by Carmody here, there is a vast difference in the "quality" of that evidence, of the impression that it makes, and of how far it goes toward shoring up allegations under Title VII. The circumstantial evidence in *Cornwell* in particular presents a more obvious opportunity for a reasonable jury to infer that perhaps plaintiff was discriminated against on account of his race.

Here, however, a reasonable jury would be unlikely to infer from the admissible evidence that BBB's explanation for disciplining and termination Carmody's employment was a pretext for retaliation. To begin with, Carmody simply has not come forward with evidence that links her allegations to her in particular in the context of either gender discrimination or a religiously hostile work environment. Further, the record does not hold sufficient facts to support Carmody's contention that she was disciplined in retaliation for complaining about "male favoritism" and religiously hostile work environment, while BBB has provided evidence that it had legitimate reasons to discipline her. This is especially true when it is noted that the three disciplinary notices were issued by different supervisors each time. Although Carmody impliedly alleges that the supervisors were in a conspiracy to terminate her employment, she has not presented any evidence of this.

Carmody has stated and testified in generalities about the tensions between the employees and her inabilities as a manager to cope with the differences over religion. However, Carmody has not provided particular examples of how the differences affected her personally or

how it led to eventual termination.  Neither does she provide particular examples or evidence of how the alleged male favoritism affected her personally, other than when the initial senior manager position was given to a male.  Although Lancaster was allegedly angry at her for "going over his head" to resolve the issues because it made him "look bad," she was a the same time put in charge of the Store in his absence.  Thus, her allegations that she was retaliated against simply for complaining about the conduct make the connection even more tenuous and remote and thus even less likely that a reasonable jury could infer a link between the conduct alleged and a retaliatory action by BBB.  Therefore, the Court finds that BBB has not violated Title VII by retaliating against Carmody.

\ \ \

\ \ \

\ \ \

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Defendant's motion for summary judgment (docket # 21), filed December 16, 2005, is GRANTED.

2)      Defendant's motion for summary judgment (docket # 22), filed December 16, 2005, is deemed to be MOOT as being duplicative of docket # 21.

3)      Defendant's motion for summary judgment (docket # 23), filed December 16, 2005, is deemed to be MOOT as being duplicative of docket # 21.

DATED: **April 24, 2006**

_____
Honorable Mikel H. Williams
United States Magistrate Judge